COPY

AUG **0 3** 2010


MICHAEL K JEANES CLERK
M. LEDESMA
DEPUTY CLERK

1  Barbara J. Forde, #013220
   20247 N. 86th Street
2  Scottsdale, AZ 85255
   (602) 721-3177
3  Pro Se Plaintiff

4

5                    **SUPERIOR COURT OF ARIZONA**

6                         **MARICOPA COUNTY**

7  BARBARA J. FORDE, a married woman
   dealing with her sole and separate        No.   CV2010-053734
8  property,

9              Plaintiff,                     **COMPLAINT FOR INJUNCTIVE
                                              RELIEF AGAINST ALL
10       v.                                   DEFENDANTS; VACATE
                                              SUBSTITUTION OF TRUSTEE,
11 FIRST HORIZON HOME LOAN                    ASSIGNMENT OF DEED OF TRUST,
   CORPORATION, a Kansas Corporation;         and NOTICE OF TRUSTEE'S SALE;
12 METLIFE HOME LOANS, a division of          QUIET TITLE TO PLAINTIFF;
   METLIFE BANK, NA; THE BANK OF              BREACH OF DUTY OF GOOD
13 NEW YORK MELLON f/k/a THE                  FAITH AND FAIR DEALING;
   BANK OF NEW YORK, as Trustee for           NEGLIGENT PERFORMANCE OF
14 the HOLDERS OF THE                         UNDERTAKING; FRAUDULENT
   CERTIFICATES, FIRST HORIZON                MISREPRESENTATION/
15 MORTGAGE PASS-THROUGH                      FRAUDULENT CONCEALMENT;
   CERTIFICATES SERIES FH05-FA8;              FRAUD; CONSUMER FRAUD
16 FIRST HORIZON HOME LOANS, a
   division of FIRST TENNESSEE BANK
17 NATIONAL ASSOCIATION;
   MORTGAGE ELECTRONIC
18 REGISTRATION SYSTEMS, INC., a
   Delaware Corporation; QUALITY LOAN
19 SERVICE, CORPORATION, a California
   Corporation; JOHN AND JANE DOES 1-
20 15, XYZ CORPORATIONS 1-15; ABC             **JURY TRIAL DEMANDED**
   LIMITED LIABILITY COMPANIES 1-
21 15; and 123 BANKING ASSOCIATIONS
   1-15,
22

23             Defendants.

24

25

26       COMES NOW Plaintiff Barbara J. Forde, and for her cause of action against Defendants,

and alleges as follows:

1.      At all times mentioned herein, Plaintiff has been in possession of her property at 20247 North 86th Street, Scottsdale, Arizona, 85255 (the "Property").   She is a resident of Maricopa County, Arizona and has held title to the Property since March of 2002.

2.      Venue is proper in this Court, as the Property is located within its jurisdiction in Maricopa County, Arizona, and because Plaintiffs are still in possession of said Property, more fully described as:

> LOT 21, OF GRAYHAWK PARCEL 3j, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 536 OF MAPS, PAGE 15 [exception deleted].

## PARTIES

3.      At all relevant times, Defendant First Horizon Home Loans Corporation ("First Horizon") is a Corporation formed under the laws of the state of Kansas, having an address of 4000 Horizon Way, Irving, Texas 75063.   First Horizon is listed as the Lender in the original InterestFirst Note ("Note") dated August 1, 2005, and on the Deed of Trust ("DOT") dated August 1, 2005, recorded in the Maricopa County Recorder's Office at Document No. 2005-1125547 on August 8, 2005, allegedly securing the original principal amount of $650,000.00. First Horizon's authority to conduct business in Arizona was revoked on April 25, 2008.

4.      On information and belief, MetLife Home Loans, a division of MetLife Bank, N.A. ("MetLife"), has been the servicer of the Note, or the lender.   MetLife's principal place of business is 4000 Horizon Way, Irving, Texas, 75063.   MetLife Bank is a national banking association regulated by the Office of the Comptroller of the Currency ("OCC").

////

5.      At all relevant times, Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Corporation formed under the laws of the state of Delaware.  MERS is listed as the Beneficiary in the DOT, and "is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns."  On information and belief, MERS has no authority to conduct business of any kind in Arizona.

6.      On April 14, 2010, MERS assigned the DOT to The Bank of New York Mellon f/k/a The Bank of New York ("BNY Mellon"), as Trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FH05-FA8, by First Horizon Home Loans, a division of First Tennessee Bank National Association, Master Servicer, in its capacity as agent for the Trustee under the Pooling and Servicing Agreement.  The Assignment was recorded on April 15, 2010.

7.      On information and belief, the First Horizon Mortgage Pass-Through Certificate Series FH05-FA8 is governed by the First Horizon Alternative Mortgage Securities Trust 2005-FA8 (the "Trust").  This Trust contains assets of approximately $537,837,255, which may include the Note.  The trustee of the Trust is BNY Mellon.  On information and belief, BNY Mellon is regulated by the OCC.

8.      Plaintiff is unaware of the identity of the Certificate Holders for whom BNY Mellon is Trustee, at present.  If the Certificate Holders are indispensable parties, BNY Mellon must reveal their identities and Plaintiff will amend the Complaint to add them as defendants.

9.      First Horizon Home Loans ("FHHL") is a trade name registered at the Arizona Corporation Commission on July 26, 2007, and is owned by First Tennessee Bank National Association (First Tennessee"), domiciled in Tennessee.  On information and belief, FHHL is a

division of First Tennessee and is the Master Servicer/agent for Trustee BNY Mellon under a Pooling and Servicing Agreement which may pertain to this loan. First Tennessee is regulated by the OCC. FHHL is not registered as a subsidiary of First Tennessee, with the OCC.

10.     At all relevant times, Defendant Quality Loan Service, Corporation ("QLS") is a Corporation formed under the laws of the state of California, having a principal address of 2141 5th Avenue, San Diego, California 92101. QLS is conducting business in Arizona as a foreclosure mill on behalf of First Horizon and, on information and belief, many other lenders.

11.     Plaintiff is currently unaware of the identity and capacity of JOHN AND JANE DOES 1 through 15, XYZ CORPORATIONS 1 through 15, XYZ LIMITED LIABILITY COMPANIES 1 through 15, and 123 BANKING ASSOCIATIONS 1-15, but will amend the Complaint when their identities have been ascertained. Plaintiff alleges upon information and belief, however, that each and every presently unknown Defendant is in some manner responsible for the acts or conduct of other Defendants, or were and/or are responsible for the injuries, damages, and harm incurred by Plaintiff.

## FACTS

12.     On August 1, 2005, Plaintiff refinanced her home loan and entered into the Note and DOT with First Horizon in the amount of $650,000.00. The Note is an interest-only Note accruing interest at the rate of 6.625% for the first 10 years. First Horizon is the lender on the Note. An unauthenticated copy of the Note is attached hereto as Exhibit "A."[1] First Horizon is also listed as the lender on the Deed of Trust, but MERS is listed as nominee for Lender, and MERS is the *only* beneficiary under the Deed of Trust. *See* Deed of Trust, attached hereto as

---

[1]    In response to Plaintiff's dispute of a Debt Validation Notice, QLS sent Plaintiff this unauthenticated copy of the Note. Plaintiff is unaware if this is an actual copy of the original Note she signed; it certainly does not include copies of allonges or endorsements, and therefore is an incomplete copy.

Exhibit "B," showing First Horizon as the Lender, North American Title as the Trustee, and MERS as the sole Beneficiary.

13.    MERS was created by a group of lenders who sell/trade promissory notes secured by deeds of trust/mortgages.  The purpose for MERS is to save lenders, investors and others who buy and/or sell mortgage loans, the effort and expense of recording an assignment of the deed of trust or mortgage each time the note associated with that deed of trust or mortgage is sold.

14.    Lenders capitalizing on the pooling of mortgages and packaging them for sale, would name MERS as nominee on the deed of trust or mortgage, with MERS as sole beneficiary. After that, regardless of how many times a note was sold or transferred, the deed of trust/mortgage was not transferred with it.  The deed of trust/mortgage remained in the name of MERS.

15.    Home loans which are set up with the deed of trust/mortgage going straight to MERS as sole beneficiary, separate the note and the deed of trust/mortgage, from the closing date forward.

16.    MERS rarely, if ever, takes possession of promissory notes.

17.    MERS has no financial interest in any promissory note, or deed of trust/mortgage assigned to it.  Its only function is to keep the security in its name to save those benefitting from the buying and selling of mortgage-backed securities, any recording fees.

18.    MERS has saved lenders and others using its services over two billion dollars ($2,000,000,000) since its inception in 1999.

19.    MERS requires those which use MERS' services to be members of MERS.

20.    Members of the public, whose deed of trust/mortgage are in MERS' name, are

blocked from access to the database which allegedly contains information about who owns the promissory note related to the deed of trust/mortgage signed by the borrower, or any other information about a particular note and deed of trust, other than the name of the loan servicer.

21.     As the economy took a turn for the worse in 2008, Plaintiff began to have difficulty making her mortgage payments and meeting other creditor obligations as they became due.    She contacted First Horizon for assistance.    First Horizon told Plaintiff that loan modification programs were available for her, and mailed Plaintiff a loan modification package with a cover letter, dated December 4, 2008. The letter began, "We listen.  We understand.  We care.  Most importantly, we want to help you."  The letter continued, "[w]e hope you feel as strongly about protecting your home as we do about trying to help you."  As a result, First Horizon lead Plaintiff to believe that First Horizon was on her side, and had as much motivation to assist her in keeping her home as she did.  A copy of this December 4, 2008, letter is attached hereto as Exhibit "C."

22.     Plaintiff submitted her loan modification package (the "First Package") to the First Horizon Loss Mitigation Department on December 5, 2008, which according to First Horizon, required only a copy of the last two months' pay stubs and a hardship letter explaining the reason for the delinquency.  Plaintiff was promised that she would receive a response from First Horizon within fifteen (15) days.

23.     Plaintiff then received a notice from FHHL, dated December 9, 2008, that her mortgage was two months in arrears.  The notice invited Plaintiff to call First Horizon "to discuss alternatives to foreclosure."  The letter listed 4 different possibilities of ways in which Plaintiff would be allowed to modify her loan and keep her home.  Because Plaintiff has just submitted her

First Package, she took no action in response to this letter.

24.     Plaintiff then received a letter from FHHL dated December 31, 2008, indicating that if she did not bring the loan current within 30 days, by January 30, 2009, her home would be put into foreclosure.

25.     On January 8, 2009, Plaintiff refaxed her request for a loan modification, indicating that the First Package was already submitted on December 5, but that no one has responded within the promised 15 days.  Plaintiff also provided a 3-page Borrower Financial Statement on First Horizon Home Loan's own form.  She pleaded for someone to acknowledge her request.

26.     On January 9, 2009, Loan Counselor Latoya N. Freeman of MetLife Home Loans e-mailed Plaintiff, confirming receipt of the faxed First Package.  Ms. Freeman stated that 3 months of profit and loss statements would be required, and invited Plaintiff to submit them.

27.     Within two hours, Plaintiff provided the requested profit and loss statements to Ms. Freeman via e-mail.

28.     On January 13, 2009, Plaintiff e-mailed Ms. Freeman to confirm that she had received the profit and loss statements. Ms. Freeman responded that she had, and that the file was "waiting to be assigned to a specialist."  Plaintiff then asked Ms. Freeman about the letter claiming that foreclosure would begin on January 30, and whether that was suspended.  Ms. Freeman responded, "as long as the specialist has it you will be ok.  It takes 30/45day [sic] for a review once the specialist has it."

29.     On January 20, 2009, Plaintiff received a letter dated January 13, 2009, from FHHL.  The letter acknowledged receipt of Plaintiff's "workout package," and continued, "[t]he

loss mitigation most likely to be approved to assist you in retaining possession of your home will be directed towards the present hardship...." Plaintiff was again lead to believe that she would be granted a modification, and quickly.

30.     On January 26, 2009, Plaintiff again e-mailed Ms. Freeman, asking for confirmation that the demand of payment in full by January 30 had been withdrawn.  Ms. Freeman responded, "[t]here is a temporary hold on the account pending loss mitigation review if you have any questions please call 800-364-7662 x33805. We cannot communicate by email."

31.     Plaintiff was accordingly denied access to any individual who could answer her questions and give her information.  Plaintiff respected Ms. Freeman's request, and called the number given for status checks of the First Package, thereafter.

32.     On March 11, 2009, Plaintiff spoke with Anthony, who told her that the First Package was still under review, but that Justin Ailey was her processor.  Plaintiff left a message for Mr. Ailey requesting status.  Plaintiff tried again on March 18 and April 2, 2009, to reach Mr. Ailey but he never answered his extension.  Plaintiff left messages each time.  Mr. Ailey never communicated with Plaintiff in any manner regarding the First Package, in spite of her repeated requests for information.  After January 26, 2009, Plaintiff was never able to again contact a person at First Horizon with actual knowledge of the First Package, in spite of her best efforts to do so.

33.     On April 8, 2009, Jim Montes of QLS, appointed his employer QLS as the substitute trustee, in place of North American Title, through a Substitution of Trustee (the "First Substitution").  Mr. Montes purported to sign as "attorney in fact" for First Horizon Home Loans, a division of First Tennessee Bank National Association.  The Substitution claimed that First

Horizon Home Loans was the present Beneficiary under the Deed of Trust.  This assertion was in fact false; MERS was the Beneficiary.  The false First Substitution was recorded on April 10, 2009, at Doc. No. 20090320518.

34.    Also on April 8, 2009, Jim Montes of QLS, acting under the false First Substitution, signed and recorded a Notice of Trustee's Sale (the "First Notice"), setting a sale date of July 10, 2009.  The First Notice was recorded on April 10, 2009, at Doc. No. 20090320519.

35.    On April 11, 2009, Plaintiff received a telephone call from Kristin S. High of MetLife Home Loans, asking if Plaintiff was going to pay the past due balance, of $29,696.62, in full.  Plaintiff told Ms. High that she had a loan modification package pending with First Horizon. Ms. High told Plaintiff that not only had the First Package been denied, but that foreclosure proceedings had already been initiated, and her loan sent to a foreclosure attorney on April 8.

36.    Shocked that she had been given no notice that the First Package had been denied, and no opportunity to bring the loan current before foreclosure proceedings were initiated and attorney's fees incurred, Plaintiff asked what she could do to prevent the loss of her home.  Ms. High suggested that Plaintiff submit another workout package and request that the foreclosure be postponed.  Ms. High indicated that Plaintiff's package would be given high priority status and would quickly be reviewed due to the pending foreclosure.

37.    On April 13, 2009, based on the encouragement from Ms. High, Plaintiff again submitted a workout package (the "Second Package") to First Horizon.  Her financial status had improved in that she had more income and debt had been reduced.

38.    Plaintiff called First Horizon on April 13, 2009, and spoke with Joe.  She asked if

making a payment would help, and he responded that no payment except payment in full, now including attorney's fees and costs, would be accepted.

39.     Accordingly, Ms. High's initial question to Plaintiff on April 11, regarding Plaintiff's intentions of bringing the past due balance current, was made in bad faith. The foreclosure had already begun and nothing short of full reinstatement and attorney's fees and costs, would have been accepted.

40.     Days after the April 11 telephone call, Plaintiff received two letters from FHHL. One letter notified Plaintiff that her loan had been sent to McCarthy & Holthus to initiate foreclosure and suggested she contact the Loss Mitigation Department if full reinstatement was not possible. The other letter also stated her loan had been sent to an attorney for foreclosure, and detailed 4 different ways in which Plaintiff could possibly "delay or even alleviate the current legal action...." The letter urged Plaintiff to contact Loss Mitigation immediately to "discuss all options available." Because Plaintiff had recently spoken to Ms. High, and submitted a new Second Package on April 13, she took no action on these letters. Rather, Plaintiff relied on the information provided by Ms. High, that her new Second Package would be given expedited attention and her foreclosure would be postponed based on the Second Package submitted.

41.     Plaintiff was sent, by certified mail, fifteen (15) identical packets from QLS, all postmarked April 16, 2009, which enclosed the false First Substitution, the First Notice, an unsigned Statement of Breach or Non-Performance, a Debt Validation Notice, an Important Notice Regarding Alternatives to Foreclosure, and a note from FHHL (the "First Foreclosure Packet"). A copy of one of the fifteen packets is attached hereto as Exhibit "C."

42.     The Debt Validation Notice in the First Foreclosure Packet, prepared by QLS, set

forth the amount of delinquency and the principal balance owed, along with other costs.   The

Notice indicated that MetLife Home Loans, a division of MetLife Bank NA, was the creditor.

43.     The Alternatives to Foreclosure Notice in the First Foreclosure Packet, prepared

by QLS, stated, "your lender is very interested in discussing options that may help you avoid

foreclosure, BUT YOU MUST TAKE IMMEDIATE ACTION AND CALL TODAY."

44.     The Statement of Breach or Non-Performance indicated that Plaintiff was in

breach of the loan.   It was not signed; instead the name Rochelle Matkin was typed in, in the

signature blank.  Rochelle Matkin was listed as "agent" of First Horizon Home Loans, a division

of First Tennessee Bank National Association.  In fact Ms. Matkin works for QLS.

45.     The note from FHHL in the First Foreclosure Packet stated, among other things,

"DO YOU FEEL AS IF NO ONE CARES?  FIRST HORIZON HOME LOANS CAN HELP....

[D]o not give up hope.  A variety of assistance programs may be available....  Call our Loss

Mitigation Department today....  Or to start the process immediately, fax the information...."

Various options for keeping your home are listed, and the borrower is then urged to "HELP US

HELP YOU" by sending in all the information listed for a modification of the loan.

46.     Unable to reach anyone at Loss Mitigation to determine the status of her Second

Package, fearing that the Second Package would be denied on the eve of foreclosure, completely

ignorant of the fact that the creditor was falsely identified, that the Note was unsecured due to its

separation from the DOT, that the First Substitution was false and improper, and the First Notice

therefore invalid, unaware of other material defects with the foreclosure, and in fear of losing her

home of seven years, Plaintiff called QLS on April 15, to determine the amount required for a

payoff, to reinstate her loan.

47.     On April 21, 2009, QLS provided a total payoff amount of $33,694.52, which included foreclosure attorney's fees and costs of $2,618.00.

48.     Apparently due to Plaintiff's comment to Ms. High on April 11, that Plaintiff would submit another workout package, FHHL sent Plaintiff a cover letter and blank Borrower Financial Statement and form Hardship Letter, dated April 22, 2009.   The letter began, "We Listen.   We understand.   We care.   Most importantly, we want to help you."   The letter told Plaintiff that if she provided the requested information, "we can begin working with you to find a solution."   And again, "[w]e hope you feel as strongly about protecting your home as we do about trying to help you."   Plaintiff had already submitted her Second Package on April 13, and so took no action related to this correspondence.

49.     Rather than risk losing her home at the eleventh hour, believing that the foreclosure had legally been initiated, by parties legally entitled to foreclose, and unable to get the expedited processing promised by Ms. High, Plaintiff liquidated her 401(k) and used 100% of those funds, along with other cash, to wire the reinstatement payoff amount of $33,729.52 to QLS on May 5, 2009.

50.     Had Plaintiff been aware of the illegal nature of the foreclosure proceedings, she would not have liquidated her 401(k) or paid the reinstatement amount, and would have instead filed suit.

51.     By letter dated May 5, 2009, First Horizon sent Plaintiff a confirmation of receipt of her Second Package faxed on April 13, 2009.   The letter gave the average review period for the Second Package as being 15 to 30 days.   By the time Plaintiff received this letter, she had already wired the reinstatement payoff.

52.     On May 26, 2009, QLS recorded a notice cancelling the trustee's sale set for July 10, 2009.

53.     Plaintiff made her monthly loan payments for June, July, August, and September, 2009.

54.     Because of continued income struggles, Plaintiff contacted a non-profit organization, Money Management International, to seek help regarding her options for getting First Horizon to agree to a modification of her loan.   She spent 1 ½ hours on the phone with Patrick Robbins on September 19, 2009, providing information to him so that he could send a recommendation to First Horizon.

55.     Mr. Robbins then made a certified Hope Now Referral to First Horizon and to HUD recommending a Making Home Affordable Plan-Loan Modification to 31% of gross monthly income, under President Obama's Plan, for which Plaintiff qualified.   Mr. Robbins told Plaintiff that she did not have to be delinquent on her loan payments to qualify.

56.     As a result of the Hope Now Referral, First Horizon sent Plaintiff a new workout package, with a cover letter dated September 18, 2009, indicating that First Horizon was using Faslo Solutions, L.L.C. ("First American") to assist in evaluating Plaintiff's loan.   This was the first time that First Horizon proactively contacted Plaintiff regarding her financial difficulties; she believed that finally, with the Hope Now Referral, First Horizon would act in good faith on her modification request and she would receive the assistance she had been waiting for.   The cover letter stated, "[w]e will work with you in an effort to make your mortgage payment affordable." The letter said Plaintiff wouldn't have to pay any fees for a modification.   The letter continued, "[n]ow is the time to act.   We are ready to help you."

47.     On April 21, 2009, QLS provided a total payoff amount of $33,694.52, which included foreclosure attorney's fees and costs of $2,618.00.

48.     Apparently due to Plaintiff's comment to Ms. High on April 11, that Plaintiff would submit another workout package, FHHL sent Plaintiff a cover letter and blank Borrower Financial Statement and form Hardship Letter, dated April 22, 2009.  The letter began, "We Listen.  We understand.  We care.  Most importantly, we want to help you."  The letter told Plaintiff that if she provided the requested information, "we can begin working with you to find a solution."  And again, "[w]e hope you feel as strongly about protecting your home as we do about trying to help you."  Plaintiff had already submitted her Second Package on April 13, and so took no action related to this correspondence.

49.     Rather than risk losing her home at the eleventh hour, believing that the foreclosure had legally been initiated, by parties legally entitled to foreclose, and unable to get the expedited processing promised by Ms. High, Plaintiff liquidated her 401(k) and used 100% of those funds, along with other cash, to wire the reinstatement payoff amount of $33,729.52 to QLS on May 5, 2009.

50.     Had Plaintiff been aware of the illegal nature of the foreclosure proceedings, she would not have liquidated her 401(k) or paid the reinstatement amount, and would have instead filed suit.

51.     By letter dated May 5, 2009, First Horizon sent Plaintiff a confirmation of receipt of her Second Package faxed on April 13, 2009.  The letter gave the average review period for the Second Package as being 15 to 30 days.  By the time Plaintiff received this letter, she had already wired the reinstatement payoff.

57.     Plaintiff put together a comprehensive package, providing all information requested, and sent the package (the "Third Package") by FedEx to First American in Westlake, Texas, as specified in the instructions from First Horizon.  FedEx delivered the Third Package to First American on October 6, 2009, at 8:33 a.m.

58.     On October 14, 2009, Joe with First American telephoned Plaintiff.  Joe asked if Plaintiff was still interested in a loan modification, and Plaintiff told him, she was.  Plaintiff was again reassured that First Horizon was finally listening and that she would receive a reasonable loan modification from First Horizon, as a result of the Hope Now Referral.  Joe began to ask for all the information received at First American on October 6.  Plaintiff told Joe they had already received everything; he said it would take 2 weeks for the information to "upload" and that the process would be quicker if she gave the information over the phone.  Plaintiff complied, spending over an hour on the telephone giving Joe all the information that was already in the First American offices.

59.     After Plaintiff gave Joe at First American all the information he requested, Joe told her it would take 30 to 45 days to determine which program she qualified for.

60.     As of November 4, 2009, Plaintiff had not made her October loan payment.  She telephoned First American and told Perla that Plaintiff would be making the October and November loan payments that week.  Perla told Plaintiff that if she was current on her loan, First American would not be able to modify her loan.

61.     Plaintiff then asked Perla for confirmation that First American had all that was needed to analyze the Third Package.  Perla told Plaintiff that a lease agreement for a rental property was needed, as well as the gross year to date rental income for that property.  Perla

claimed that First American had been leaving messages about the missing documentation; in fact no messages had been left.  Plaintiff sent the requested information to First American on November 6, 2009.

62.     Confused and alarmed that First American said she had to be delinquent to get assistance, Plaintiff called First Horizon on November 6, 2009, and spoke with Carol Lynn in the loan servicing center.  Plaintiff asked if she would be denied a modification if she were current on her loan.  Plaintiff told Carol Lynn that under the Making Home Affordable plan, a borrower can qualify for a modification even if current on payments.  Carol Lynn indicated that if the borrower is current, First Horizon believes the borrower does not need any help.

63.     On November 19, 2009, Plaintiff called First American to check the Third Package status. Mark told Plaintiff that her file was still under review, that she would hear within 30 days, and that First American had all information needed to analyze the loan.

64.     Given her conversations with a First American employee and a First Horizon employee who both told her she must be in default to qualify for a modification, Plaintiff stayed in default on her loan.

65.     On January 5, 2010, Plaintiff called First American and requested a status of her Third Package.  She was told that someone noted on the account on December 16, 2009, that borrower should send complete profit and loss statement.  Plaintiff asked who was supposed to contact Plaintiff and notify her that this information was needed; the representative put Plaintiff on hold and never returned.  Plaintiff called back and spoke with Sonya, who said nothing is needed on the file and the Third Package is still under review.  Plaintiff asked Sonja how Plaintiff is supposed to get information from First American on what further documents are needed; Sonja

responded that notes are made in the file, but no requested from the borrower, until the borrower happens to call for the status of the pending application.

66.     Not wanting her loan to go into foreclosure status, Plaintiff attempted to make an online payment which was rejected by First Horizon, and returned.  Plaintiff called and spoke with Eric who took an electronic payment covering two months of accrued charges, on January 19, 2010.

67.     Also on January 19, Plaintiff called regarding the status of her Third Package, and was told by Perla that the Third Package was under review, and that it would take 2 to 6 weeks for verification from the date of September 18, 2009, then 30 to 45 business days for processing after that.  Perla said that as of November 10, all necessary information had been received.  She was completely unable to state where in the process Plaintiff's loan was, saying there was "no way to tell."

68.     On January 26, 2010, Plaintiff again called for status.  She was told by Anacari that by February 24, 2010 at the latest, Plaintiff would receive an answer.  Anacari then told Plaintiff that she needed to submit profit and loss statements for all of 2009, by month.  When Plaintiff asked why she was not told this on January 19 when she called, Anacari simply said, "Sorry."

69.     By this time, Plaintiff realized that without the help of someone experienced in working with lenders on workouts, she would find herself in the same situation she had been before: First Horizon acting as though it is working on her workout, providing no information, and then declining the workout before she had an opportunity to determine why or provide the information for which the application was denied.  Plaintiff hired Michael Hirschtick of National

1   Credit Rescue to take over working with First American/First Horizon, on February 2, 2010.

2        70.   It seemed at this point that First American/First Horizon would continue to ignore

3   Plaintiff's Third Package, and lie to her about the time by which it would be reviewed and acted

4   upon, unless a deadline was in place.  Plaintiff believed she would have to let her home go into

5   foreclosure status before her workout file would be given priority and reviewed and acted upon

6   by the defendants.

7        71.   On February 22, 2010, First Horizon requested that Mr. Hirschtick essentially

8   resend all the documents which had already been sent.  The Third Package was resent on

9   February 23, 2010.  First Horizon used this as an excuse to "reset" the age of Plaintiff's Third

10  Package, claiming hereafter that it was submitted to First Horizon on March 2, 2010, when in fact

11  **Plaintiff's Third Package has been pending with First Horizon since October 6, 2009**.

12       72.   On March 8, 2010, in spite of all the promises from First Horizon about its desire

13  to help Plaintiff, and that it would "work with you in an effort to make your mortgage payment

14  affordable," and in spite of the Hope Now Referral, Plaintiff received a letter from FHHL, via

15  certified mail, demanding payment in full of all arrearages by April 1, 2010, or foreclosure would

16  be initiated.

17       73.   On March 13, 2010, Plaintiff received a call from Brandon, work I.D. VKC, from

18  MetLife.  Brandon asked if Plaintiff could make a mortgage payment.  At this point, Plaintiff

19  feared that if she made a payment, her Third Package would be placed on hold, or put at a low

20  priority, or First Horizon would simply continue with foreclosure anyway, or decline her Third

21  Package because she was able to make a payment.  Plaintiff told Brandon she had to hire

22  someone to work with First Horizon/First American because no one will listen, answer the phone,

or respond to her.

74.    Brandon of MetLife checked on her Third Package, told her Mr. Hirschtick had sent a new package on March 2, and that it would be assigned to a processor within 10 business days.  He told her that by Monday or Tuesday a processor would be assigned.  Plaintiff expressed frustration with the inability to speak with someone who knows what is going on, and her experience of calling to be sure everything First American needs is present, only to call the next time and find out First American claims something was needed 30 days ago, that was never requested.  All Brandon did was apologize for Plaintiff's getting the runaround on her Third Package.

75.    Mr. Hirschtick took over handling the workout with First Horizon/FHHL/MetLife, on Plaintiff's behalf.  Over the course of the next 6 months, up to the time of filing this Complaint, First Horizon, FHHL, MetLife, and their agents, have negligently and/or intentionally obfuscated the process and been extremely difficult to contact; made no less than *11 promises* that the Third Package would be assigned to a processor within 1 week, and/or that the file would be "escalated" resulting in expedited review; told the Plaintiff's agent on many occasions that all documentation was needed only to revoke that representation and demand more information in an apparent attempt to buy more delay time; admitted that First American, an agent hired to handle the loan modification packages, was negligent and wholly unable to perform under their agreement and was terminated; failed to adequately supervise their agent with respect to processing the loan modification packages resulting in the loss of precious time to homeowners seeking assistance and in the issuance of false declination letters; and admitted that they shut their fax machine off at night, and when it is on it will accept only 20 pages at a time.

76.     First Horizon/FHHL/MetLife's promises regarding analysis and assignment of the file, made to Plaintiff, include, but are not limited to, the following:   December 5, 2008- will process within 15 days; January 13, 2009- 30 to 45 days after assignment to a specialist; May 5, 2009- 15 to 30 days to process; October 14, 2009- 30 to 45 days to process; November 19, 2009- 30 days to process; January 19, 2010- 2 to 6 weeks from September 19, 2009 to perform verification, then 30 to 45 business days to process; January 26, 2010- will have an answer to the package by February 24, 2010; March 13, 2010- will be assigned to a processor in 10 days; April 5, 2010- will be assigned to a processor in 10 to 15 days; July 28, 2010- will be assigned to a processor within 10 to 15 days after information requested is "uploaded" into system.

77.     First Horizon/FHHL/MetLife's promises regarding assignment within a week and/or escalation of the file were made to Mr. Hirschtick on no less than the following dates: April 28, May 7, May 19, May 24, May 28, June 3, June 15, July 1, July 8, July 15, and July 20, 2010.  Attached hereto as Exhibit "D" is a complete list of the telephone contact Mr. Hirschtick has made with First Horizon/FHHL/MetLife and their agents on Plaintiff's behalf, and the responses he has received during those calls, through July 22, 2010.

78.     On March 23, 2010, in spite of all the calls Mr. Hirschtick made to First American/First Horizon on a weekly basis, in spite of providing all information requested, and in spite of continuing to be told that no processor had even been assigned to the Third Package, First Horizon sent a letter to Plaintiff telling her that her request for Loss Mitigation Assistance had been declined.  Mr. Hirschtick called to determine what the letter was about, and was told that the letter was sent in error.  First Horizon told Mr. Hirschtick to ignore the letter, that it was false.

////

79.     On April 5, Colleena from First Horizon's default resolution department called and asked what Plaintiff's intentions were regarding the past due balance. Plaintiff told her she had a loan modification package pending with First Horizon since last October. Colleena checked the status, and saw the Third Package on file. First Horizon's representative said that it would take 10 to 15 days for a processor to be assigned, and then 60 to 90 business days for final resolution.

80.     During the call on April 5, the First Horizon representative said nothing to Plaintiff about the intent to send the loan to foreclosure.

81.     On April 12, FHHL sent Plaintiff two different letters. One letter notified Plaintiff that her loan had been sent to McCarthy & Holthus to initiate foreclosure and suggested she contact the Loss Mitigation Department if full reinstatement was not possible. The other letter also stated her loan had been sent to an attorney for foreclosure, and detailed 4 different ways in which Plaintiff could possibly "delay or even alleviate the current legal action...." The letter urged Plaintiff to contact Loss Mitigation immediately to "discuss all options available."

82.     On information and belief, the Defendants have a policy and/or practice of:  1) refusing to assist any homeowner who is current on their payments in spite of numerous available programs which allow borrowers to be current and modify their loans; 2) luring borrowers into default by telling them that no help can be provided if the borrower is current; 3) leading borrowers to believe that once in default, they will qualify for and be given a loan modification, with their constant messages regarding how much they "care," "listen," "understand," and "are ready to help you," knowing that these representations are false; 4) promising a response to a loan modification, or assignment of a processor to a workout package, within a small number of days (usually 10 to 15 days) with knowledge that this representation is false, and with specific intent

that the borrower rely on the representation by taking no further action and making no mortgage payments; 5) holding the loan modification package, without assigning a processor, long enough that the information becomes stale so that more recent documents can be demanded, resulting in further delay for the documents to "upload" into their system and refusing to assign a processor until the documents have been "uploaded,"; 6) waiting for the borrower to be so far in arrears due to the borrower's reliance and belief that defendants will stand by their word and act in good faith, that it is impossible for the borrower to come current; 7) placing the loan into foreclosure, all the while assuring the borrower that the workout package will be analyzed in short order, knowing that this representation is false; 8) knowingly processing the foreclosure paperwork in violation of the law, all the while hoping that borrowers don't have the knowledge to defend or the money to hire an attorney to defend; 9) considering its own interests as servicer of the loan above the interests of the borrower or the investor, 10) continuing, even after a trustee's sale is noticed, to lead the borrower to believe that its workout package will be analyzed, that the borrower has options short of full reinstatement, and that the lender "is very interested in discussing options that may help you avoid foreclosure," and that they want the borrower to "help us help you," knowing that the borrower will rely on these representations which are false; and 11) waiting until just before the trustee's sale to deny the workout package, and foreclose before the borrower can take any further action, or simply foreclose in spite of a pending workout package.

83.    On April 14, 2010, MERS purportedly assigned its beneficial interest in the DOT to BNY Mellon by way of an Assignment of Deed of Trust ("Assignment"). The Assignment claims that it is assigning not only the beneficial interest under the Deed of Trust, but also "the

Promissory Note secured by said Deed of Trust…." A copy of the Assignment is attached hereto in Exhibit "E."

84.    The Assignment was recorded on April 15, 2010, at Doc. No. 20100317611. Tim Bargenquast, described as Vice President of MERS, signed the Assignment. On information and belief, Bargenquast is not now, and never has been, an employee of MERS.

85.    In fact, Tim Bargenquast is a Support Staff Manager for QLS. Bargenquast is not an Officer of, or even employed by, a member of MERS. Bargenquast is not even an Officer of QLS. Bargenquast cannot legally be appointed as a certifying officer/agent of MERS.

86.    Accordingly, the Assignment of DOT signed by Bargenquast on April 14, 2010, recorded on April 15, 2010, is void and of no force and effect.

87.    On May 15, 2010, Plaintiff received two notices from FHHL, dated May 4, 2010. The notices were identical, and both stated that Plaintiff's Loss Mitigation Assistance package had been declined.   Shocked, because her Third Package had never even been assigned to a processor, Plaintiff sent the notices to Mr. Hirschtick.

88.    On May 17, Mr. Hirschtick called First Horizon, and was told that the letter was sent in error by First American, which no longer even performs any work for First Horizon. Mr. Hirchstick was told that First American was unable to handle the volume or detail work required to adequately analyze workout packages, and so its contract with First Horizon had been terminated. First Horizon told Mr. Hirschtick to ignore the letter, that it was erroneously issued and false.  Mr. Hirschtick was told to call back later in the week to find out to whom the Plaintiff's Third Package had been assigned.

////

89.     On May 27, 2010, another Notice of Substitution of Trustee (the "Second Substitution") was recorded against Plaintiff's property.   The Second Substitution was purportedly made by The Bank of New York Mellon f/k/a The Bank of New York, executed by Marcia Williams, designated as Assistant Vice President.   The Second Substitution claims that BNY Mellon is the beneficiary under the Deed of Trust, and purports to substitute QLS as trustee. On information and belief, Ms. Williams is employed by First Horizon, not BNY Mellon.

90.     The Second Substitution was not signed by an authorized officer of BNY Mellon, accordingly, it is void.

91.     On May 26, 2010, Earl Hopida, designated as an Assistant Vice President of QLS, signed a Notice of Trustee's Sale (the "Second Notice"), claiming to be the trustee under the Deed of Trust, and claiming to act on behalf of the alleged beneficiary under the Deed of Trust, BNY Mellon.  The Notice was recorded on May 27, 2010, at Doc. No. 20100450248.

92.     Mr. Hopida is variously described on the Notices of Trustee's Sale that he signs on behalf of QLS's foreclosure mill practice, as a Vice President and as an Assistant Vice President.

93.     The Second Notice is void and of no force and effect, because the Assignment is void and the Second Substitution is void.

94.     No filing has been made at the Maricopa County Recorder's office showing a resignation of North American Title as the original Trustee under the Deed of Trust, and a new appointment of Trustee, for QLS.

95.     The Second Substitution is void because North American Title did not resign, because the Assignment to BNY Mellon is void because Ms. Williams is an employee of First Horizon, and because the beneficiary under the DOT did not appropriately appoint QLS.

96.     Competing Substitutions of Trustee are on record at the Maricopa County Recorder's Office, appointing QLS as trustee, by two different alleged beneficiaries, on two different dates, namely April 10, 2009, and May 27, 2010.  QLS has never filed a resignation as Trustee under the Deed of Trust pursuant to the April 10, 2009 appointment.

97.     Plaintiff was sent, by regular and by certified mail, thirteen (13) identical packets from QLS, all postmarked June 3, 2010, which enclosed the Second Substitution, the Second Notice, an unsigned Statement of Breach or Non-Performance, a Debt Validation Notice, an Important Notice Regarding Alternatives to Foreclosure, and a note from FHHL (the "Second Foreclosure Packet").  A copy of one of the thirteen packets is attached hereto as Exhibit "E."

98.     The Debt Validation Notice in the Second Foreclosure Packet, prepared by QLS, set forth the amount of delinquency and the principal balance owed, along with other costs.  The Notice indicates that MetLife Home Loans, a division of MetLife Bank NA, is the creditor.

99.     The Important Notice Regarding Alternatives to Foreclosure in the Second Foreclosure Packet, prepared by QLS, states, "your lender is very interested in discussing options that may help you avoid foreclosure, BUT YOU MUST TAKE IMMEDIATE ACTION AND CALL TODAY."

100.    The Statement of Breach or Non-Performance in the Second Foreclosure Packet states that Plaintiff is in breach of the loan.  It is not signed; instead the name Chris Thurman is typed in, in the signature blank.  Chris Thurman is listed as "agent" of First Horizon Home Loans, a division of First Tennessee Bank National Association.   On information and belief, Mr. Thurman works for QLS.

////

101.    The note from FHHL in the Second Foreclosure Packet states, among other things, "DO YOU FEEL AS IF NO ONE CARES?  FIRST HORIZON HOME LOANS CAN HELP.... [D]o not give up hope.  A variety of assistance programs may be available....  Call our Loss Mitigation Department today....  Or to start the process immediately, fax the information...." Various options for keeping your home are listed, and the borrower is then urged to "HELP US HELP YOU" by sending in all the information listed for a modification of the loan.

102.    Because Plaintiff's Third Package was already pending, Plaintiff was disappointed that FHHL did not make any mention of it.  Because her Third Package had been pending for over three months, and Mr. Hirschtick was in constant contact, Plaintiff did not contact FHHL in response to this note.

103.    On June 22, 2010, Plaintiff sent QLS a dispute of the Debt Validation Notice, and requested documents.

104.    QLS responded to Plaintiff's Debt dispute letter by letter dated July 2, 2010.  In that letter, QLS provides a copy of the Note, and claims that MetLife is in possession of the original promissory note.  QLS also states that its authority to proceed with, or halt, the foreclosure sale comes from BNY Mellon.  QLS stated that it would be proceeding with the foreclosure sale on August 27, 2010, as scheduled.  A copy of the letter from QLS is attached hereto as exhibit "F."

105.    Plaintiff has therefore been provided information indicating that Defendants do not know who is in possession of the Note, and Plaintiff now doubts that the original Note exists any longer.  QLS claims that MetLife is the creditor and is in possession of the Note; MERS purported to assign the Note to BNY Mellon in the Assignment, and the description of the alleged

- 25 -

current beneficiary of the DOT indicates that the Note was sold into a pool as a part of a mortgage-backed security, and is subject to a Pooling and Servicing Agreement ("PSA"). The mortgage pool could contain tens, hundreds, or thousands of investors, all with a claim to a portion of the Note.

106.    If any of these defendants are allowed to enforce the Note without producing the original with all endorsements and allonges showing that particular defendant's authority to enforce the Note, Plaintiff is in jeopardy of other individuals and/or entities appearing at a later date and claiming legitimate and legal entitlement to payment under the Note. This will result in double liability for the Note, or more.

107.    On July 7, 2010, Plaintiff sent FHHL a Qualified Written Request ("QWR"), under 12 U.S.C. § 2605(e), via certified mail and regular mail, seeking information about her loan, its servicing, ownership, and other critical issues. A copy of Plaintiff's QWR is attached hereto as Exhibit "G."

108.    On July 12, 2010, Plaintiff sent Quit Claim Deeds and cashier's checks for $5.00 to each of the following defendants: FHHL, MetLife, First Horizon, and BNY Mellon.

109.    On July 28, 2010, Plaintiff received the $5.00 cashier's check payable to MetLife, stapled to a letter dated July 21, 2010, which purports, in the letterhead, to be from both First Horizon Home Loans, and FHHL. Although the letter contains boxes to check in order to tell the recipient what the letter is about, none of the boxes are checked. In this one piece of correspondence, three different defendants are referenced. This letter only contributes to the confusion regarding who owns the Note, and who is the proper party to contact regarding Plaintiff's Third Package. A copy of the July 21, 2010 letter and the returned cashier's check is

1    attached hereto as Exhibit "H."

2          110.    Also on July 28, 2010, Plaintiff received a letter dated July 15, 2010, which

3    purports to be from both First Horizon Home Loans and FHHL. This letter simply states that

4    correspondence has been received, and that a response will be sent within 60 days. On July 28,

5    Plaintiff called the number given on the letter, as the one to call with any questions. Chanel

6    answered, and Plaintiff stated that since she has submitted so many documents to First Horizon

7    and FHHL, that she cannot tell to what this letter pertains. Chanel told Plaintiff she could not

8    find any such letter, and became irate with Plaintiff when Plaintiff stated that the letter came from

9    First Horizon, so there must be a record, and Plaintiff needed to know to what the letter pertained.

10   Plaintiff asked to speak with a supervisor; none were available. Chanel took Plaintiff's name and

11   number for a supervisor to call back. To date, no supervisor has ever called.

12

13         111.    As of July 28, 2010, less than 30 days before the Trustee's Sale date of August 27,

14   2010, defendants have failed to post the Property with the Notice of Trustee's Sale as required by

15   A.R.S. § 33-808(A)(3).

16

17                                     **COUNT ONE**

18   **VACATE SUBSTITUTIONS OF TRUSTEE, ASSIGNMENT OF DEED OF TRUST,**
     **AND VACATE NOTICE OF TRUSTEE'S SALE**
19                                  **(ALL DEFENDANTS)**

20         112.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

21         113.    The appointment of QLS as Substitute Trustee on April 10, 2009, and again on

22   May 27, 2010, was improper.

23

24         114.    The First Substitution and the Second Substitution did not comply with A.R.S.

25   §33-804(D), which states:

26

> A notice of substitution of trustee shall contain a description of the basis for the successor trustee's qualification pursuant to section 33-803, subsection A.   A notice of substitution of trustee shall be sufficient if acknowledged by all beneficiaries under the trust deed or their agents as authorized in writing and if prepared in substantially the following form....

115.   The First Substitution was not prepared by MERS, which was the sole beneficiary under the DOT; it was signed by a representative of QLS, Jim Montes, purporting to sign for FHHL, which was *not* the beneficiary under the DOT.  The First Substitution was signed by QLS, appointing *itself* as trustee.

116.   The Second Substitution was purportedly signed by BNY Mellon but in fact was signed by Marcia Williams, an employee of First Horizon.  First Horizon was *not* the beneficiary under the DOT, nor was BNY Mellon, as the purported April 14, 2010 assignment of the DOT from MERS to BNY Mellon was void, having been signed by a low-level employee of QLS, Tim Bargenquast.

117.   The appointment of QLS as Substitute Trustee must also fail under Arizona Revised Statutes §33-804(F), which states:

> Resignation by a trustee is made by recordation of a notice of resignation in the office of the county recorder of each county in which the trust property or some part of the trust property is situated at the time of the resignation.  Written notice shall be given through registered or certified mail, with postage prepaid, to the trustor and the beneficiary.

118.   A trustee must resign before a new trustee may be appointed.

119.   No filing has been made at the Maricopa County Recorder's office showing a resignation of North American Title, and a new appointment of QLS.

120.   Since North American Title has not resigned as required by A.R.S. §33-804(F) and no resignation has been duly recorded as required, both Substitutions of Trustee appointing QLS

must fail.  No provisions in A.R.S. § 33-804, or any other applicable statute, allow more than one trustee on one property at the same time.

121.    Defendants have failed to properly post the Property with the Second Notice, as required by A.R.S. § 33-808(A)(3).

122.    The DOT signed by Plaintiff on August 1, 2005, shows MERS as the sole beneficiary, and states MERS is "acting solely as a nominee for [First Horizon]...."

123.    MERS has no authority to conduct business of any kind in the State of Arizona; any document signed and/or recorded by MERS in Arizona is void and of no force and effect.

124.    MERS has never had any interest in, or been a holder of, the Note.

125.    Any attempt to assign the beneficial interest in the DOT to another, without simultaneously being the holder of the Note, is void.

126.    MERS has no authority to assign the deed of trust.

127.    The Note and DOT were separated at loan inception.

128.    No defendant has been both the holder of the Note and the beneficiary of the DOT simultaneously.

129.    The Assignment of the DOT from MERS to BNY Mellon, was signed by a low level employee of QLS, Tim Bargenquast, but he purports to be signing as Vice President of MERS.

130.    The Assignment of the DOT from MERS to BNY Mellon is void.

131.    Therefore, the First and Second Substitutions of Trustee are void, the Assignment is void, and the Notices of Trustee's Sale are void.  In addition, the Trustee's Sale must be vacated for failure to post the Property under A.R.S. § 33-808(A)(3).

132.   All defendants have breached their obligations as set forth in, among other laws, Arizona statutes relating to foreclosures; defendants have also breached their obligations to the Plaintiff, by allowing their agents/employees to sign documents without legal authority, thereby initiating a trustee's sale, with the goal of taking Plaintiff's home, without legal basis.

133.   The Trustee's Sale set for August 27, 2010 must be vacated and cancelled.

134.   Plaintiff is entitled to her attorney's fees and costs arising out of this claim, pursuant to the contracts between the parties and A.R.S. § 12.341.01.

**COUNT TWO**

**QUIET TITLE**
**(ALL DEFENDANTS)**

135.   Plaintiff repeats and realleges every allegation above as if fully set forth herein.

136.   At the time the loan closed on August 1, 2005, and thereafter, the Note gave First Horizon the right to payments.

137.   Plaintiff has been given conflicting information about the holder of the Note. QLS has told Plaintiff that MetLife has the Note, the Assignment claims that MERS assigned the Note to BNY Mellon, and the description of the alleged current beneficiary of the DOT indicates that the Note was sold into a pool as a part of a mortgage-backed security with an undisclosed number of holders/investors of the Certificates, called the First Horizon Mortgage Pass-Through Certificates Series FH05-FA8. This Certificate Series is subject to a PSA.

138.   On information and belief, the First Horizon Mortgage Pass-Through Certificate Series FH05-FA8 is governed by the First Horizon Alternative Mortgage Securities Trust 2005-FA8 (the "Trust"). This Trust contains assets of approximately $537,837,255, including the Note. The trustee of the Trust is BNY Mellon.

139.    Plaintiff has no knowledge of, and no way to determine, who the legal holder of the Note is, who is entitled to payments, and whether the Note still exists.

140.    Plaintiff is in jeopardy, as the true holder of the Note and potentially dozens or even thousands of third parties could come forward claiming an unsatisfied interest in the Note, and may or may not be subject to Plaintiff's various affirmative defenses and counterclaims. Plaintiff is entitled to proof of the true holder of the Note to avoid this imminent danger.

141.    At the time the loan closed on August 1, 2005, MERS was the sole beneficiary under the DOT.  MERS remained the sole beneficiary until at least April 15, 2010.  The Deed of Trust was entered on the MERS system with MIN # 100085200547038630.

142.    The DOT does not give MERS any greater rights than normally given a nominee. The DOT says that MERS acts solely as nominee for Lender.  There is no express grant of any right to MERS to transfer or sell the DOT or the Note, or assign its duties as a nominee, nor does MERS obtain any right to Plaintiff's payments or to serve in the role of receiving or servicing the Note payments.

143.    The Assignment recorded on April 15, 2010, which purports to assign the DOT and the Note from MERS to BNY Mellon under the signature of Bargenquast, is void.  The Assignment as it relates to the Deed of Trust is void because Bargenquast, a low level employee of QLS, is not a legally appointed certifying officer of MERS, and because MERS has no authority to assign the DOT.  The Assignment is further void because MERS has no authority to assign the DOT.  The Assignment as it relates to the Note is void because MERS has never had an interest in the Note to assign, nor does it have the authority to assign the Note.

144.    A note and deed of trust are inseparable.  If a note and deed of trust are separated,

in that the holder of the note and the beneficiary of the deed of trust are not the same individual or entity, the note becomes unsecured.

145.    Upon closing in August of 2005, the holder of the Note was First Horizon.   The beneficiary of the DOT was MERS.   The Note and DOT have been separated since the inception of this loan.

146.    The assignment of a deed of trust without a legal transfer of the debt, transfers nothing.

147.    The Assignment of the DOT is invalid.   There has been no evidence to show that First Horizon had given authority for MERS to assign it; further, the purported Assignment is signed by an employee of QLS.   In addition, the DOT is a nullity.   Having been separated from the debt in August of 2005, the DOT secures nothing.

148.    The Assignment of the Note is invalid; MERS is not the holder of the Note, an assignment is not the proper method for transfer of a note, and the purported Assignment is signed by an employee of QLS.   QLS has never been the holder of the Note.

149.    Defendants seek to enforce the Note and DOT.   The Note having been unsecured since the date of loan closing, August 1, 2005, no Defendant may legally pursue foreclosure pursuant to the Deed of Trust.

150.    No Defendant has standing to pursue foreclosure, as no one Defendant is both the beneficiary of the DOT and also the holder of the Note.

151.    Various defendants have filed documents against the Property, without the legal authority to do so.   Those documents include, but are not limited to, the First and Second Substitutions of Trustee, the Assignment of Deed of Trust, and the First and Second Notices of

1   Trustee's Sale.

2       152.    Plaintiff is entitled to an order from this Court that the Plaintiff's estate in the

3   Property be established in her, that title be quieted in her name, that all illegally recorded

4   documents be declared null and void with filings at the Maricopa County Recorder's Office to

5   that effect, and that all Defendants be barred and forever estopped from having or claiming any

6   right or title to the Property, adverse to Plaintiff, and that the Deed of Trust be declared void and

7   of no force and effect, and be released by a recording at the Maricopa County Recorder's Office.

8

9       153.    Pursuant to A.R.S. § 12-1103(B), Plaintiff is further entitled to her attorney's fees

10  and costs against Defendants FHHL, MetLife, BNY Mellon, and First Horizon, as she tendered a

11  quit claim deed and $5 to each entity, more than 20 days before the filing of this Complaint.

12                                  **COUNT THREE**

13

14  **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
    **(FIRST HORIZON, FHHL, METLIFE, MERS, BNY MELLON)**

15

16      154.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

17      155.    Defendants are obligated under the Note and DOT, and the common law, to act in

18  good faith and to deal fairly with Plaintiff.

19      156.    The purpose of the covenant is to guarantee that the parties remain faithful to the

20  intended and agreed expectations of the parties in their performance.

21

22      157.    The duty of good faith extends beyond the written words of the contracts.

23      158.    When a party or parties to a contract manipulate bargaining power to its/their own

24  advantage, injuring the other party, the party/parties with bargaining power breach its/their duty

25  of good faith.

26

- 33 -

159.    Plaintiff reasonably expected that the defendants would use good faith and deal fairly in processing her loan modification package, and, based on their written and verbal communications with her, that their goal was to help her keep her home, which would inure to her benefit and well as theirs.

160.    Defendants and/or their agents routinely and regularly breach their duty of good faith and fair dealing by:

a.      failing to perform loan servicing and process loan modification requests consistent with their responsibilities and representations, to Plaintiffs;

b.      failing to properly supervise employees/executives including, without limitation, loss mitigation/loan modification and collection personnel and foreclosure attorneys;

c.      failing to employ adequate and competent staff to timely review loan modifications ;

d.      failing to purchase and maintain adequate office equipment and to keep it operating, to keep up with the demands of the loan modification packages being submitted by borrowers at defendants' invitation;

e.      routinely demanding information already in its files;

f.      making inaccurate calculations and determinations of Plaintiff's eligibility for loan modification programs, including telling Plaintiff she must be in default to qualify;

g.      failing to follow through on written, verbal and implied promises, including without limitation the time frame within which the package will be processed;

h.      failing to follow through on contractual obligations, including without limitation taking action to foreclose in direct contravention of contract terms;

i.      luring Plaintiff into default and engaging in dilatory tactics, resulting in Plaintiff's delinquency being so great that she cannot reinstate her loan;

j.      participating in a system of loan documentation, processing, and servicing, which hides from the borrower the identity of the holder of the note, and the beneficiary of the deed of trust, supported by a continuing refusal on the part of all defendants, to provide any information regarding these issues, to the borrower.

161.    As a result of these failures to act in good faith and the absence of fair dealing, defendants have caused Plaintiffs harm.

162.    As this claim arises out of the contracts between the parties, Plaintiff is entitled to her attorney's fees and costs incurred in having to bring this claim, pursuant to the terms of the contracts as well as A.R.S. § 12-341.01.

## COUNT FOUR

### NEGLIGENT PERFORMANCE OF UNDERTAKING
### (GOOD SAMARITAN DOCTRINE)
### (FIRST HORIZON, FHHL, METLIFE)

163.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

164.    Defendants voluntarily put in place, a loan modification program available to their borrowers.  Borrowers experiencing problems paying their mortgage were encouraged, even urged, to submit a modification package.

165.    Pursuant to defendants' program, defendants undertook to modify Plaintiff's loan. Defendants sent numerous correspondence and notes, and had many conversations with Plaintiff, in which Defendants encouraged Plaintiff to submit a modification package, and in which defendants assured Plaintiff, over and over again, that defendants "care," understand," "listen,"

and "want to help."

166.    Defendants indicated multiple times that many modification options were available to Plaintiff, and that they wanted to help Plaintiff.

167.    Plaintiff was told she had to be in default to receive help; Plaintiff defaulted as a result.

168.    In spite of promises to help Plaintiff, defendants did not have adequate staffing, resources, or equipment to administer its own loan modification program.

169.    Defendants negligently hired third parties to administer the program.  Defendants terminated the third parties' contracts due to the negligent administration of the program by those third parties.

170.    Defendants failed to employ adequate and competent staff, and failed to timely review loan modifications requests.

171.    Defendants failed to purchase and maintain adequate office equipment and to keep it operating, to keep up with the demands of the loan modification packages being submitted by borrowers at defendants' invitation.

172.    Defendants routinely demanded information already in its files.

173.    Defendants made inaccurate calculations and determinations of Plaintiff's eligibility for loan modification programs, including telling Plaintiff she must be in default to qualify.

174.    Defendants failed to follow through on written, verbal and implied promises, including without limitation the time frame within which Plaintiff's package would be processed.

////

175.    Defendants engaged in dilatory tactics, resulting in Plaintiff's delinquency being so great that she cannot reinstate her loan, and resulting in a Trustee's Sale being set on the Property.

176.    Defendants' negligence resulted in such delay that her First Package was denied, a call placed to her demanding the balance in full, and notification that the First Trustee's Sale had been noticed, all in the same phone call.

177.    Defendants' negligence resulted in Plaintiff's need to liquidate her 401(k) in order to bring her loan current and keep her home.

178.    Plaintiff relied on the defendants to administer the loan modification program, and process her application for a loan modification, in a timely manner and with due care.

179.    Defendants' negligence in administering its loan modification program has resulted in economic harm to the Plaintiff.

180.    Plaintiff has suffered monetary damages from liquidation of her 401(k) in poor economic times, adverse tax consequences from the early liquidation, severe and potentially permanent damage to her credit rating, and other harm.

181.    Plaintiff is entitled to damages from the defendants as a result of their negligent administration of their loan modification program.


## COUNT FIVE

## FRAUDULENT MISPREPRESENTATION/FRAUDULENT CONCEALMENT
## (ALL DEFENDANTS)

182.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

183.   Defendants invited Plaintiff to submit a loan modification package and lead her to believe that they were interested in helping her keep her home.

184.   Defendants told Plaintiff she would not receive a modification of her loan unless she was in default, which caused Plaintiff to default on her loan.

185.   Defendants put Plaintiff in a position where she was at the mercy of their good faith, fair dealing, and honesty.

186.   Defendants knew the truth, but misrepresented and concealed the truth from Plaintiff, including but not limited to, the following truths:

a.   defendants could offer Plaintiff a loan modification program without her being in default;

b.   defendants allowed unauthorized signatures on the documents, including documents required to be recorded at the county recorder's office to initiate and schedule the foreclosure, resulting in the noticing of a void trustee's sale;

c.   defendants did not have adequate and competent staff to timely and properly process her loan modification package;

d.   defendants negligently hired others to process the loan modification packages, who themselves were negligent, costing Plaintiff months of delinquency on her loan;

e.   defendants did not even have adequate office equipment to keep up with the demands of the loan modification packages being submitted by borrowers at defendants' invitation, and defendants would turn their facsimile machines off at night and program them to reject any pages faxed after the twentieth page;

f.   defendants would routinely demand information already sent to them/in their files;

g.     defendants would fail to follow through on written, verbal and implied promises, including without limitation the continual promises that Plaintiff's loan modification would be assigned to a processor within one week, that the file would be "escalated," or that First Horizon/FHHL/MetLife cares, wants to help, and wants borrowers to keep their homes;

h.     defendants would fail to follow through on contractual obligations, including without limitation, take action to foreclose through the use of unauthorized signatures;

i.     defendants would lure Plaintiff into default and engage in dilatory tactics, resulting in Plaintiff's delinquency being so great that she cannot reinstate her loan;

j.     defendants' employees in the loss mitigation/loan modification department knew the status of her loan modification package but claimed ignorance each time Plaintiff or her agent called;

k.     defendants delayed in assigning the loan modification packages to processors until the information in the package was stale, requiring supplementation, which would then allow defendants more delay due to alleged "uploading" time for documents, with another 10 to 15 days before a processor would be assigned;

l.     defendants were participating in a system of loan documentation, processing, and servicing, which hides from the borrower the identity of the holder of the note, and the beneficiary of the deed of trust, supported by a continuing refusal on the part of all defendants, to provide any information regarding these issues, to the borrower.

187.     Defendants prevented Plaintiff from learning any of these truths.

188.     As a result of defendants' fraudulent misrepresentations/concealment, Plaintiff has suffered pecuniary loss.

**COUNT SIX**

**FRAUD**
**(ALL DEFENDANTS)**

189.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

190.    Beginning at least with a modification package sent to Plaintiff in December of 2008, and through the present, defendants have engaged in a systematic process of making false and misleading representations to Plaintiff to cause her to believe that the defendants "listen," "understand," "care," and "want to help" Plaintiff modify her loan.

191.    Plaintiff was further mislead into believing that the defendants would exercise due care with respect to her loan modification requests, follow the law, and legally and appropriately administer their loan modification program or fulfill their legal duties, as the case may be.

192.    The representations made to Plaintiff include, but are not limited to:

a.      defendants could not offer Plaintiff a loan modification program without her being in default;

b.      defendants had adequate and competent staff to timely and properly process her loan modification package, free of negligence or intentional misconduct;

c.      defendants hired agents to process the loan modification packages, who would timely and appropriately do so, to the benefit of Plaintiff;

d.      defendants had the resources, including adequate office equipment, to keep up with the demands of the loan modification packages being submitted by borrowers at defendants' invitation;

e.      defendants would timely place all information from Plaintiff, including supplemental information provided, into her file, and would not ask for information already

1    provided;

2        f.      defendants would follow through on written, verbal and implied promises,

3    including without limitation the eleven promises made to Mr. Hirschtick that Plaintiff's loan

4    modification would be assigned to a processor within one week, and that the file would be

5    "escalated," for expedited review;

6

7        g.      defendants' employees in the loss mitigation/loan modification department had no

8    way of telling, when Plaintiff or her agent called, what the status of her loan modification

9    package was;

10       h.      the foreclosure documents filed in April of 2009 and again in May of 2010, were

11   legal, contained authorized signatures, and properly initiated the foreclosure process which would

12   legally result in Plaintiff's losing her home;

13
     i.      that in spite of foreclosure being initiated, defendants wanted to help, discuss
14
     alternatives to foreclosure, were willing to modify her loan, and could delay or even alleviate the
15
     foreclosure; and
16

17       j.      that if Plaintiff could just wait one week, that her package would get attention and

18   defendants would help her.

19
     193.    All of these representations were false when made, or believed to be true, and
20
     subsequently learned to be false.
21

22       194.    All of these representations were material.

23       195.    Defendants knew that the representations were false, were unaware of whether the

24   representations were true or not, or believed them to be true but defendants later learned the

25   representations were false.

26

196.    The defendants intended Plaintiff to rely on their representations, and therefore take no other action to protect herself from delinquency, default or foreclosure.

197.    Plaintiff was not aware that the representations were false, and she was never notified by defendants that any representations made by them were later determined to be false.

198.    Plaintiff relied the truthfulness of the representations.

199.    Plaintiff had a right to rely on defendants' representations.

200.    As a result, Plaintiff suffered damages.

201.    Defendants actions were with malice, ill will, and a wonton disregard for the rights of the Plaintiff.  Plaintiff is entitled to punitive damages from the defendants.


**COUNT SEVEN**

**CONSUMER FRAUD**
**(ALL DEFENDANTS)**

202.    Plaintiff repeats and realleges every allegation above as if fully set forth herein.

203.    The defendants use deception, false promises, misrepresentations, concealment, and suppression or omission of material facts, when they engage in the pattern and practice of allowing documents to be signed by individuals without legal authority, allowing those false documents to be recorded at the Maricopa County Recorder's Office, and proceeding with trustee's sales pursuant to void documents, in violation of Arizona law.

204.    Defendants First Horizon, FHHL, and MetLife also use deception, false promises, misrepresentations, concealment, and suppression or omission of material facts, when they and/or their agents:

a.    promise to make a good faith analysis of Plaintiff's loan modification requests;

1        b.      lured Plaintiff into defaulting by leading her to believe that was the only way they

2   could help her;

3        c.      promised in excess of 11 times in three months, with respect to the Third Package,

4   that her modification package would be assigned to a negotiator and an answer would be provided

5   shortly;

6

7        d.      promised that all documents needed to process the package were received, only to

8   later request more documents;

9        e.      imply, through offering and encouraging participation in their loan modification

10  program, that they actually have competent staff and sufficient office equipment and resources to

11  handle loan modification requests;

12

13       f.      hire agents who negligently handle the loan modification program, causing many

14  precious months in delay of processing loan modification packages;

15       g.      delay in assigning a processor to a loan modification package until the information

16  provided was stale, demand supplementary documents, which in turn allows defendants to claim

17  delays associated with "uploading" the supplemental documents into the file, which in turn delays

18  the assignment of a processor;

19       h.      send out, or allowed their agents to send out, declination letters which are false;

20  and

21

22       i.      participate in a system of loan documentation, processing, and servicing, which

23  hides from the borrower both the identity of the holder of the note and the beneficiary of the

24  DOT, supported by a continuing refusal on the part of all interested parties, to provide any

25  information regarding these issues, to the borrower.

26

205.     This deception, these false promises and misrepresentations, concealment, and suppression or omission of material facts, were made in connection with the intended sale of merchandise, the definition of which includes real estate.

206.     Defendants engaged in this course of conduct with the intent that Plaintiff would rely on their false promises, deception, misrepresentations and concealment, go into default, seek a loan modification, and ultimately lose her home in foreclosure.

207.     As a consequence, Plaintiff suffered damages and injury.

208.     Plaintiff is entitled to punitive damages against all defendants for their wanton and reckless conduct which shows spite and ill will, and demonstrates a reckless indifference to Plaintiff's interests.

## COUNT EIGHT

### TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION; PERMANENT INJUNCTION
### (ALL DEFENDANTS)

209.     Plaintiff repeats and realleges every allegation above as if fully set forth herein.

210.     If Arizona were a judicial foreclosure state, the issue of the burden of proof would be on the party seeking affirmative relief, the creditor.

211.     The purpose of the non-judicial foreclosure statutes is judicial economy.  But those statutes are now allowing the lenders and their business associates who failed to properly document matters in their rush to profit, take homes from hard-working people, without proving standing, entitlement to payment, or appropriate documentation to proceed.

212.     Plaintiff is bringing this cause of action to stop the improper sale of her home, and this cause of action is intended to be an express denial of the Defendant's claims against the

Property.  Plaintiff denies that defendants are the "lender" or "creditor" and that Plaintiff owes any of the Defendants any obligation of payment, without strict proof thereof.

213.   Defendants are improperly attempting to sell her property using tactics and procedures that do not comply with Arizona law, and without standing or legal authority to do so, as set forth in detail in the factual section and in the claims asserted above.

214.   Plaintiffs request that this Court not allow the proposed sale to occur until a full hearing on the asserted claims have been heard, and evidence as to the Defendants' standing to litigate and continue in this case has been presented.

215.   Plaintiff will suffer immediate and irreparable injury, harm, loss and damage if the Trustee's Sale is not cancelled, and this Complaint is not allowed to proceed on its merits.

216.   On information and belief, the Note has been sold many times to entities that have securitized the Note.  As set forth above, Plaintiff has been given conflicting information from the various defendants regarding the identity of the entity entitled to enforce the Note.  If, as QLS asserts, the Note is in a securitized mortgage pool, it is governed by a Pooling and Service Agreement ("PSA").  Plaintiff has requested a copy of the PSA from First Horizon, but no copy has been received.

217.   On information and belief, if the Note is in a securitized mortgage pool, the governing PSA states that there must be two recorded sales between the loan's origination and its being placed into the mortgage pool.  There likely exists evidence that the investors of the mortgage pool are the real holders of the Note.

218.   Because of the default on this loan in 2009 and 2010, there likely also exists evidence that the Note has already been paid off by credit default swaps purchased by the

mortgage pool. In that event, any real party in interest may be an insurance company with a subrogation claim, but none of the defendants herein.

WHEREFORE, Plaintiff requests the following relief:

1. For a Declaration and Order that the Assignment of the Deed of Trust from MERS to BNY Mellon be declared null and void, of no force and effect, and in violation of Arizona law;

2. For a Declaration and Order that the Statement of Breach or Non-Performance and Election to Sell under Deed of Trust be declared null and void, of no force and effect, and in violation of the requirement that it be signed, and signed by the lender;

3. For a Declaration and Order that the First and Second Substitutions of Trustee are declared null and void, of no force and effect, and in violation of Arizona law;

4. For a Declaration and Order that the First and Second Notices of Trustee's Sales are declared null and void, of no force and effect, and in violation of Arizona law;

5. For a Declaration and Order that the Trustee's Sale scheduled for August 27, 2010, be cancelled and cancellation of same be recorded at the Maricopa County Recorder's Office immediately, and that a Trustee's Sale not again be rescheduled on the Property unless Plaintiff loses on the merits of all her claims;

6. For a Declaration and Order that each of the defendants must prove that it is the legal holder of the Note, and therefore legitimately able to pursue collection of the Note;

7. For a Declaration and Order that because the Note and DOT, which are inseparable to be enforceable, have been separated since the inception of this loan, rendering the Note unsecured and the DOT of no force and effect, and ordering that title to the Property is quieted in favor of Plaintiff;

8.     For damages sustained by the Plaintiff as a result of the negligence and/or intentional conduct of the defendants, or otherwise, as allowed by law;

9.     For punitive damages to deter the defendants and punish them for the torts they have engaged in at Plaintiff's expense;

10.     For judgment for Plaintiffs' legal fees and costs incurred, pursuant to ARS § 12-341.01, as this matter arises out of a contract, and pursuant to A.R.S. § 12-1103(B).

11.     For interest on the reasonable attorney's fees, court costs, and other costs of collection at the highest legal rate from the date of entry of judgment herein until paid in full; and

11.     For such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury as a matter of right.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 3rd day of August, 2010.

Barbara J. Forde, Esq.
20247 N. 86th Street
Scottsdale, AZ  85255
Pro Se Plaintiff